**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MARCE GONZALEZ, JR.**
Dyer, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**AARON J. SPOLARICH**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JERMAINE MARCEL NASH, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 45A05-1210-CR-553 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Thomas P. Stefaniak, Jr., Judge
Cause No. 45G04-1107-FB-61

**July 26, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**ROBB, Chief Judge**

## Case Summary and Issue

Following a jury trial, Jermaine Nash was convicted of attempted rape, a Class B felony, and criminal confinement, a Class C felony, for which he was sentenced to consecutive terms of eighteen and six years, respectively. In addition, Nash admitted to being a repeat sex offender and received an eight-year sentence enhancement, for an aggregate sentence of thirty-two years. Nash appeals, raising one issue for our review: whether his convictions of criminal confinement and attempted rape violate principles of double jeopardy. Concluding Nash has demonstrated a reasonable possibility that the evidentiary facts used by the jury to establish attempted rape may also have been used to establish the essential elements of confinement, we reverse the confinement conviction and sentence.

## Facts and Procedural History

In the summer of 2011, Amy Brown was living at the home of Kishonna Kirk and Kirk's daughter, N.J. On the evening of July 18, 2011, Brown invited two childhood friends, Nash and Shawn Drayton, to visit her at Kirk's house. Kirk, and later N.J., eventually joined them, and throughout the evening, they all watched movies in the living room. Nash had removed his tennis shoes and left them by the door of Brown's bedroom. Brown and Drayton eventually retired to her bedroom, leaving Kirk, N.J., and Nash in the living room. Brown told Nash to come to her room when the movie was over. Shortly thereafter, N.J. came to Brown's room to tell her good night and went to her bedroom in the basement.

In the early morning hours, as N.J. lay in bed on her stomach, she was awakened by a shadow passing over her and then she experienced pressure on her back and head

2

which felt as though someone was on top of her. A hand or arm was pushing her face into the pillow causing her to have trouble breathing. She was eventually able to turn her head and see Nash's face but was otherwise unable to move due to his holding her down with his arm on her back. Nash roughly pulled N.J.'s underwear off and then tried to get her legs apart with his hand. When he was able to separate her legs, he tried to insert his penis into her vagina but stopped when Kirk came downstairs.

Kirk had slept on the couch, and when she woke up, she noticed Nash's shoes were still by the door of Brown's bedroom. She looked for N.J. in her room and Brown's room and then went downstairs. She saw feet reflected in a mirror that sat at the foot of N.J.'s bed and began yelling, "What's going on?" Transcript at 162. Nash scrambled off N.J., unclothed from the waist down, and Kirk saw his erect penis. Kirk also saw that N.J. was unclothed from the waist down. As Kirk went to the bed to check on her daughter, Nash gathered up his clothes. Kirk then went to get her cell phone, which was in the kitchen, calling out for help as she went up the stairs. Nash followed her up the stairs and into the kitchen. The noise had awakened Brown, who went to check on N.J. as Kirk picked up a knife and began to scuffle with Nash. Nash eventually fled the house, barefoot, and the police were called.

Police who had responded to the call at Kirk's house received a dispatch about a man one or two blocks away who had been stabbed. An officer who responded to that scene found Nash, without shoes and with a stab wound to the head. N.J. was taken to the hospital where she underwent a sexual assault examination. N.J. reported pain to her back, abdomen, and vagina. Laboratory testing of samples from the sexual assault kit found the presence of DNA from Nash's paternal lineage on swabs collected from N.J.'s

cervix and underwear. Laboratory testing of blood found on a knife in Kirk's kitchen and a blood stain near the door found a one in nine quintillion likelihood that Nash was the source of the blood.

The State charged Nash with attempted rape, a Class B felony; criminal confinement as a Class C felony because of bodily injury; sexual battery, a Class D felony; and criminal confinement as a Class D felony. He was also alleged to be a repeat sexual offender. A jury found Nash guilty of all charges, and Nash admitted to the sexual offender enhancement. The trial court ordered that the sexual battery and Class D felony criminal confinement remain as jury verdicts only, entered judgment of conviction on the attempted rape and criminal confinement as a Class C felony, and sentenced Nash to consecutive terms of eighteen years and six years, respectively, enhanced by eight years for the repeat sexual offender finding, for a total sentence of thirty-two years. Nash now appeals.

Discussion and Decision

I. Standard of Review

Nash contends his convictions of both attempted rape and criminal confinement violate the Double Jeopardy clause of the Indiana Constitution.[1] Whether convictions violate double jeopardy is a question of law which this court reviews de novo. Vermillion v. State, 978 N.E.2d 459, 464 (Ind. Ct. App. 2012).

---

[1] Although Nash invokes the Fifth Amendment of the United States Constitution, he does not make any separate federal argument, focusing his argument solely on the actual evidence test of Indiana double jeopardy jurisprudence. We therefore do not address the federal double jeopardy provision other than to note that the statutory elements test of the Indiana double jeopardy clause and the Fifth Amendment test as enunciated in Blockburger v. United States, 284 U.S. 299 (1932), are substantially the same, Brown v. State, 912 N.E.2d 881, 896 (Ind. Ct. App. 2009), trans. denied, and our courts have held that convictions of both rape and criminal confinement are not precluded under the Blockburger test, see Purter v. State, 515 N.E.2d 858, 860 (Ind. 1987).

4

## II. Actual Evidence Test

Article 1, section 14 of the Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." In Richardson v. State, 717 N.E.2d 32, 49 (Ind. 1999), our supreme court held that two or more offenses are the same offense for Indiana double jeopardy purposes if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to obtain the convictions, the essential elements of one challenged offense also establish the essential elements of another challenged offense.

To prevail under the actual evidence test, "a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense." Id. at 53. "[U]nder the Richardson actual evidence test, the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense." Spivey v. State, 761 N.E.2d 831, 833 (Ind. 2002). The "reasonable possibility" that the fact-finder used the same facts to support two convictions cannot be speculative or remote, Griffin v. State, 717 N.E.2d 73, 89 (Ind. 1999), cert. denied, 530 U.S. 1247 (2000), and it must be more than a "logical possibility," Lee v. State, 892 N.E.2d 1231, 1236 (Ind. 2008). It turns on "a practical assessment of whether the jury may have latched on to exactly the same facts for both convictions." Lee, 892 N.E.2d at 1236. It is appropriate to consider the charging information, jury instructions, and arguments of counsel in evaluating the evidence from the jury's perspective. Id. at 1234.

In Lee, our supreme court noted the difference between cases in which there are separate facts to support two convictions but the case was presented in such a way that left a reasonable possibility that the jury used the same facts to establish both, and cases in which the facts supporting a first charge could theoretically have supported both convictions but additional facts supporting one of the crimes were highlighted to the jury. Id. at 1235-36. For example, in Lee, the defendant was convicted of burglary and attempted armed robbery based on what the supreme court called "evidence [that] boils down to four facts: [the defendant] barged into the home, had a gun, made threats, and demanded money." Id. at 1235. Although the defendant argued that, as a logical matter, barging into the house could have satisfied both the breaking and entering element of burglary and the substantial step element of attempted armed robbery, the court noted that the jury was presented with distinct facts supporting attempted armed robbery beyond barging into the house, namely, the threats and demands for money after barging through the door. Id. at 1235-36. The charging information for attempted robbery referenced the threats, the jury instructions restated the charge, and the State highlighted the specific facts regarding the threats during closing argument. Id. at 1236-37. The supreme court found no double jeopardy violation because "[a]s a practical matter, there is no reasonable possibility that . . . the jury used only the barging into the home and ignored the extensive testimony of threats, etc. inside the home as substantial steps toward taking property." Id. at 1237. Although the barging in could have proved both crimes, there was not a reasonable possibility that it did.

Contrast the facts of Lee with those of Bradley v. State, 867 N.E.2d 1282, 1284 (Ind. 2007), in which the defendant was charged with confinement and aggravated battery

for stabbing his wife with a knife in the back, and then pinning her over a toilet and repeatedly striking her in the head with a hammer. The criminal confinement charge alleged the defendant was armed with a hammer and caused an open head wound; the aggravated battery charge alleged defendant caused an open head wound and a knife wound. The instructions did not specify the injury required to prove each crime. Although the State argued on appeal that it was reasonable that the jury predicated its aggravated battery finding solely on the stabbing as evidence of force, the court concluded that "[f]rom the evidence and instructions, it is reasonable that the jury <u>may also</u> have found the [force] element [of aggravated battery] satisfied by the evidence of [the] open head injury inflicted by the defendant with the hammer." <u>Id.</u> at 1285 (emphasis in original). The court in <u>Lee</u> noted

> that more deliberate prosecution of multiple offenses would avoid these double jeopardy problems. Had the charges, instructions, and closing argument cited [specific and distinct facts as to each charge], there would be no double jeopardy question, and the trial and appellate courts would not have been required to assess the degree of likelihood of overlapping convictions.

892 N.E.2d at 1237.

Nash contends there is a reasonable possibility the actual evidence used by the fact-finder in finding him guilty of these two offenses was the same. He was charged with and convicted of attempted rape, which is proved by evidence that he knowingly or intentionally took a substantial step toward having sexual intercourse with N.J. when she was compelled by force or imminent threat of force. <u>See</u> Ind. Code § 35-42-4-1(a)(1); Ind. Code § 35-41-5-1(a). He was also charged with and convicted of criminal confinement, which is proved by evidence that he knowingly or intentionally confined

7

N.J. without her consent, resulting in bodily injury.  See Ind. Code § 35-42-3-3(b)(1)(C).

Considering the factors that may have guided the jury's determination, the information

charging Nash with these crimes does not specify any facts at all, let alone facts distinct

to each crime.  See Appellant's Appendix at 46 (alleging for attempted rape that Nash

"did knowingly or intentionally attempt to have sexual intercourse with [N.J.], when

[N.J.] was compelled by force or the imminent threat of force . . ." and for criminal

confinement that Nash "did knowingly or intentionally confine [N.J.] without her consent

which resulted in bodily injury to [N.J.] . . . .").  The jury instructions likewise are devoid

of specific factual allegations.  See id. at 62-63.  However, the prosecutor, during her

closing argument, stated:

> [N.J.] testified that she was held down, face-down in her pillow and while
> she was being held face-down in her pillow she felt pain to her back, felt
> pain to her head and her neck area.  That, ladies and gentlemen, is criminal
> confinement as a class C felony because when asked, "Were you able to
> leave?" She said "no".  Did she sustain bodily injury?  Yes.  And the
> definition of bodily injury includes pain.  So what do we have for the
> attempted rape?  We have [N.J.] saying that he pulled her panties off.  We
> have [N.J.] saying that she felt his tip, the tip of his penis and it was hard.
> She said that she felt the tip of his penis try to enter her vagina. . . . That is
> attempted rape.  Taking a substantial step toward the commission of a
> crime.  He was down there, he had his erect penis out.  Her clothes, her
> bottoms were off and you heard her testify that he opened up her legs, tried
> to open up her legs.

Tr. at 369-70.  The State argues the closing argument clearly delineated for the jury the

separate evidentiary facts supporting each crime and therefore there is not a reasonable

possibility the jury used the same facts to support both crimes.

The evidence the jury heard, though, is not so clear as the State's closing argument

or appellate brief would imply.  N.J. testified:

8

Q [by the State]:  Okay, what's the next thing that you remember happening after you saw the shadow and laying back down?

A:  Well, after that I felt like somebody was on me and then I looked up a little and I seen [sic] his face.

Q:  Let me stop you there.

THE COURT:  Ma'am, I can't understand you.  Can you say that again?

A:  I looked up and then it was like it was pressure, he put his arm on my back and then holding me down, pushing my head down and then that's when I could tell it was like things were happening . . . .

* * *

Q:  What happened when you felt that pressure?  Did you feel any pain?

A:  Yeah, on my back.

Q:  Could you – did you feel like you could leave at that point?

A:  No.

Q:  Were you free to go?

A:  No.

Q:  What do you remember happening next?

* * *

A:  After that that's when I had umm, I had hair in my face and I couldn't breathe and then I felt my underwear –

Q:  Okay, you say that your face was down in the pillow?

A:  Yes.

* * *

Q:  And you say that you could not breathe?

A:  Yes.

Q:  Were you hurting anywhere else?

A:  Like in my private area.

Q:  What was hurting about your private area at this point?

A:  Like the entrance part.

* * *

Q:  How did it feel when he was pulling your underwear down?

A:  It was rough.

Q:  Were you still laying on your stomach?

A:  Yes.

Q:  Where – were you being held down?

A:  Yes.

Q:  How were you being held down?

A:  With his arm.

Q:  Where was his arm?

A:  On my back.

Q:  Where was your face?

A:  In the pillow.

* * *

Q:  After the underwear was being pulled down roughly, like you said, what do you remember happening next?

9

A: Trying to get my legs opened.
Q: . . . How were your legs, how was he trying to get your legs opened?
A: With his other hand.
Q: Can you describe what that felt like?
A: It hurted but it didn't like – I didn't want to be there.
* * *
Q: Was he able to get your legs opened?
A: Yes.
Q: After he got your legs opened, what do you remember happening next?
A: He tried to go in and that's when my mom came downstairs.

Id. at 93-98. N.J.'s testimony was that she was asleep facedown on her bed when Nash climbed on top of her, held her down, removed her underwear and tried to penetrate her with his penis; she had difficulty breathing and felt pain in her back and private area. Attempted rape inherently involves a restraint on the victim's liberty. See Wells v. State, 568 N.E.2d 558, 563 (Ind. Ct. App. 1991). For criminal confinement to be a separate crime, there must be proof of force to effectuate the confinement that goes beyond that necessary to effectuate the attempted rape. See Ryle v. State, 549 N.E.2d 81, 85 n.7 (Ind. Ct. App. 1990) (discussing double jeopardy implications of convictions of both rape and confinement), trans. denied. For instance, in Purter, 515 N.E.2d at 860, rape and confinement convictions did not violate double jeopardy because the defendant confined the victim prior to the rape by holding a knife to her throat and forcing her to go to another room and after the rape by refusing to leave to prevent her from calling police. See also Sallee v. State, 777 N.E.2d 1204, 1214 (Ind. Ct. App. 2002) (rape and confinement convictions did not violate double jeopardy when, as victim gave defendant and his co-defendant a ride, defendant pulled her into the backseat and co-defendant took over driving, defendant would not let her into the front seat or out of the car despite her

pleas, and then the two defendants repeatedly raped her after taking her into their house), trans. denied.

We do not agree with the State that there were "two unique acts of compulsion" here. Brief of Appellee at 13. The State parses Nash's individual actions to try to create a confinement apart from the force used to effectuate the attempted rape. Unlike the facts of Purter, where the confinement was clearly separate from the rape, the evidence here shows only that Nash confined N.J. by holding her down on the bed, the same force by which he attempted to rape her. Neither the charges nor the jury instructions specified the acts the State in its closing and on appeal relies on, both of which put too fine a point on N.J.'s testimony. A reasonable possibility exists that the same evidentiary facts used to establish the commission of the attempted rape were also used to establish all the essential elements of confinement.

Conclusion

The Indiana double jeopardy provision bars a separate confinement conviction here because there is a reasonable possibility that, based upon the actual evidence used to obtain the convictions, the essential elements of attempted rape also established the essential elements of criminal confinement. Nash's conviction of criminal confinement is reversed, and this case is remanded to the trial court to vacate the conviction and amend Nash's sentence accordingly.

Reversed and remanded.

FRIEDLANDER, J., and CRONE, J., concur.